CHARLES G. WALKER *vs.* JENNIFER COLLYER, administratrix,[1] & others.[2]

No. 12-P-1898.

Suffolk. September 13, 2013. - May 23, 2014.

Present: COHEN, KATZMANN, & AGNES, JJ.

*Arbitration,* Appeal of order compelling arbitration, Authority of arbitrator, Arbitrable question. *Contract,* Arbitration. *Nursing Home. Medical Malpractice,* Contract with doctor. *Estoppel. Agency,* Liability of agent, Independent contractor.

Discussion of the law governing the question whether and in what circumstances a signatory to an agreement can compel a nonsignatory to arbitrate by virtue of that agreement. [315-317]

This court concluded that the question whether a nonsignatory to an agreement was bound by the arbitration clause of the agreement was a "gateway dispute" that was an issue for the court, and not an arbitrator, to decide in the first instance; further, this court concluded that it would determine the issue summarily, where the nonsignatory did not personally sign the agreement and there was, therefore, no clear and unmistakable evidence that he intended to delegate questions of arbitrability to the arbitrator. [317-318]

In a civil action challenging an order of an arbitrator that sought to compel the plaintiff, a physician at a nursing center (facility) and the medical director of the facility's subacute rehabilitation program, to participate in an arbitration proceeding commenced by the representative of the estate of a deceased patient at the facility pursuant to an agreement signed by the patient and the facility but not the plaintiff, the judge erred in entering judgment affirming the order, where principles of estoppel did not permit the enforcement of the arbitration agreement as to the nonsignatory, in that the plaintiff had taken no action to exploit the agreement, and in that an alternative path to estoppel (i.e., allowing a nonsignatory to compel a signatory to arbitrate when the nonsignatory had a close relationship with the signatory and the underlying issues for arbitration were intertwined with the agreement that the estopped party had signed) was inapplicable [318-322]; and where the plaintiff could not be compelled to arbitrate under any theory of agency (i.e., actual or apparent), in that the exception

---

[1]Of the estate of Karl Collyer.

[2]New Bedford Medical Investors, LLC, doing business as The Oaks Nursing Center; and Life Care Centers of America. These defendants have not participated in the appeal.

to the general rule that a nonsignatory may not be compelled to arbitrate only allows an agent to bind a principal by the agent's actions, rather than vice versa [323-325].

CIVIL ACTION commenced in the Superior Court Department on January 25, 2012.

The case was heard by *Carol S. Ball*, J.

*Curtis R. Diedrich* for the plaintiff.

*Scott D. Peterson* for Jennifer Collyer.

*John J. Barter*, for Professional Liability Foundation, Ltd., amicus curiae, submitted a brief.

KATZMANN, J. Charles Walker, a physician, seeks to avoid being compelled to arbitrate a medical malpractice claim brought by the representative of a deceased patient, Karl Collyer. Walker treated Karl[3] at The Oaks Nursing Center (The Oaks or the facility), a facility at which Walker practices medicine and serves as subacute rehabilitation (rehab) program medical director. Karl and the facility signed an arbitration agreement covering disputes arising from his treatment; Walker did not sign the agreement. In the Superior Court, Walker challenged an arbitrator's order compelling him to participate in an arbitration proceeding commenced pursuant to the agreement. He now appeals from the judgment entered in the Superior Court affirming the arbitrator's decision ordering Walker to arbitration. We conclude that the question whether Walker was bound by the arbitration agreement despite being a nonsignatory was a question for the court and not the arbitrator. We further conclude, based upon the undisputed material facts, that Walker is not bound by the agreement.[4]

While our courts have determined that under some circumstances a party who did not sign an arbitration agreement can take advantage of an agreement signed by an allied party to compel a signatory to arbitrate, we have not decided the question in the converse that is posed by this case: Can a signatory

---

[3]For the sake of clarity, we refer to Jennifer Collyer, in her capacity as administratrix of her deceased husband's estate, as "Collyer," and to the patient as "Karl."

[4]We acknowledge the amicus brief of the Professional Liability Foundation, Ltd.

to an arbitration agreement compel a nonsignatory to arbitrate by virtue of the agreement that he has not signed? Other courts, particularly the Federal courts, have considered such situations, enumerating the circumstances in which a signatory can compel a nonsignatory to arbitrate. We find persuasive the framework laid out clearly by the Federal courts and hold that Collyer, as administratrix of Karl's estate, cannot compel Walker to arbitrate because Collyer has failed to show the type of relationship that would establish an exception to the elemental tenet that a party cannot be required to arbitrate if he or she has not agreed to do so. Accordingly, the judgment entered by the Superior Court cannot stand.

*Background.* 1. *Undisputed facts.* Karl entered The Oaks for rehabilitation following a hip replacement at another health facility. At the time of his admission, Karl and the facility entered into a "Voluntary Agreement for Arbitration" (arbitration agreement). Karl signed the agreement, as did a representative of the facility (not Walker) on behalf of The Oaks. Walker asserts (and Collyer does not dispute) that he was not aware of the existence of the provision until the filing of this medical malpractice claim against him. The agreement includes the following broad arbitration provision:

> "The parties agree that they shall submit to binding arbitration all disputes against each other and their agents, affiliates, governing bodies and employees arising out of or in any way related or connected to the Resident's stay and care provided at the Facility, including but not limited to any disputes concerning alleged personal injury to the Resident caused by improper or inadequate care, including allegations of medical malpractice; any disputes concerning whether any statutory provisions relating to the Resident's rights under Massachusetts law were violated; and any other dispute under Massachusetts or federal law based on contract, tort, or statute."

The agreement also broadly defines the scope of the parties that it covers:

> "It is the intention of the Facility and the Resident that this Arbitration Agreement shall inure to the benefit of and

bind the Facility, its parents, affiliates, and subsidiary companies, owners, officers, directors, employees, successors, assigns, agents and insurers; and the Resident, his/her successors, assigns, agents, insurers, heirs, trustees, and representatives, including the personal representative or executor of his or her estate; and his/her successors, assigns, agents, insurers, heirs, trustees, and representatives."

Walker works at The Oaks both as an attending physician and as subacute rehab program medical director. Walker served as Karl's attending physician during his short stay at The Oaks. Walker conducted a physical examination of Karl the day after he was admitted to the facility and signed his admissions order. Walker also signed Karl's discharge order three days later. The record does not show additional examinations or treatment between the initial examination and Karl's discharge.[5]

Walker's role as the subacute rehab program medical director was governed by an agreement (contract) signed on December 18, 2006.[6] The contract states that Walker will be an independent contractor to The Oaks — not an employee. The Oaks pays Walker directly for his performance of the duties of subacute rehab program medical director. By contrast, individual patients pay Walker for his work as an attending physician.

After receiving care in the facility for four days, Karl was discharged. He died less than three days later from bilateral pulmonary thromboemboli that had resulted from deep vein thrombosis (that is, blood clots that traveled to the lungs from elsewhere in the body).

2. *Procedural history.* On behalf of Karl's estate and on her own behalf, Collyer brought an arbitration proceeding against Walker, as well as The Oaks and its parent company. This appeal pertains only to Collyer's ability to compel Walker to resolve the dispute through arbitration.

---

[5]Although Walker stated in his affidavit that he "had no further involvement in the care and treatment" of Karl after his initial examination, the parties dispute whether Walker also was responsible for Karl's care in his capacity as subacute rehab program medical director. As will become clear in our discussion, however, this dispute is not as to a material fact.

[6]The December, 2006, contract was amended on July 27, 2009. The amendments do not modify any provisions at issue here.

Walker claims that he is not bound by the arbitration agreement and thus cannot be compelled to arbitrate. After a hearing, the arbitrator determined, first, that he had the authority to determine whether the dispute was arbitrable as to Walker, and, second, that it was indeed arbitrable as to him.[7] Walker commenced an action in Superior Court seeking relief from the arbitrator's order pursuant to G. L. c. 251, § 2(*b*).[8] In his complaint, he sought (1) an order staying the arbitration pending the determination by the court whether he was a proper party to the arbitration, and (2) an order that he was not bound by the arbitration agreement. The Superior Court affirmed the arbitrator's decision requiring that Walker submit to the arbitration proceeding. Walker appeals.[9]

*Analysis.* 1. *Governing law.* Because of the dearth of Massachusetts cases on point, we address first the governing law that we apply. Regardless whether the Massachusetts Arbitration Act, G. L. c. 251, §§ 1 et seq., or the Federal Arbitration Act, 9 U.S.C. §§ 1 et seq. (2006), governs the underlying dispute (see, e.g., *Feeney* v. *Dell Inc.*, 466 Mass. 1001 [2013]), traditional principles of Massachusetts contract law determine whether nonsignatories can be compelled to arbitrate. See *Grand Wireless, Inc.* v. *Verizon Wireless, Inc.*, 748 F.3d 1, 12 & n.26 (1st Cir. 2014), citing *Arthur Andersen LLP* v. *Carlisle*, 556 U.S. 624 (2009). In applying Massachusetts law, however, we note

---

[7]The arbitrator ordered as follows:

> "For the reasons stated above [in the arbitrator's memorandum and order dated January 9, 2012], the Arbitrator concludes, and it is ORDERED, that Charles G. Walker, M.D., is bound, under the terms of the parties' 'Voluntary Agreement for Arbitration,' as a party respondent in this arbitration proceeding."

[8]General Laws c. 251, § 2(*b*), inserted by St. 1960, c. 374, § 1, provides:

> "Upon application, the superior court may stay an arbitration proceeding commenced or threatened if it finds that there is no agreement to arbitrate. Such an issue, when in substantial and bona fide dispute, shall be forthwith and summarily determined, and if the court finds for the applicant it shall order a stay of arbitration; otherwise the court shall order the parties to proceed to arbitration."

[9]The parties do not question the appropriateness of our consideration of this appeal. In any event, we exercise our discretion to entertain it. See *Smith* v. *Arbella Mut. Ins. Co.*, 49 Mass. App. Ct. 53, 54 (2000), and cases cited.

that the decisions of our courts have only comprehensively addressed the separate but related question whether a nonsignatory can take advantage of an arbitration agreement. See, e.g., *Constantino v. Frechette*, 73 Mass. App. Ct. 352 (2008). See also *Miller v. Cotter*, 448 Mass. 671 (2007), discussed in *Constantino, supra* at 357 & n.11. We have not resolved the particular question at issue here: whether and in what circumstances a signatory can compel a nonsignatory to arbitrate by virtue of an agreement he has not signed.

Until the Supreme Judicial Court's recent decisions in *Johnson v. Kindred Healthcare, Inc.*, 466 Mass. 779 (2014) (*Johnson*), and *Licata v. GGNSC Malden Dexter LLC*, 466 Mass. 793 (2014) (*Licata*), our courts had not been presented with the question whether a signatory can force a nonsignatory to arbitrate under Massachusetts law.[10] Because *Johnson* and *Licata*, in considering the particular circumstance of health care proxies, did not lay out the full range of ways to compel nonsignatories to arbitrate and ultimately did not need to address the issue before us, we look to other jurisdictions.[11]

Other courts, particularly the Federal courts, have considered such situations, enumerating the circumstances in which a signatory can compel a nonsignatory to arbitrate. See, e.g., *Thomson-CSF, S.A. v. American Arbitration Assn.*, 64 F.3d 773, 776 (2d Cir. 1995) (*Thomson-CSF*); *Bridas S.A.P.I.C. v. Government of Turkmenistan*, 345 F.3d 347, 356 (5th Cir. 2003), cert. denied, 541 U.S. 937 (2004) (*Bridas*). Because the Massachusetts Arbitration Act, at issue here, "is our enactment of the Uniform

---

[10]In *Askenazy v. KPMG LLP*, 83 Mass. App. Ct. 649, 657-658 (2013), we applied New York law to determine whether a nonsignatory could be compelled to arbitrate. In *Ross v. Health & Retirement Properties Trust*, 46 Mass. App. Ct. 82, 86 (1998), in dicta, we noted several circumstances in which nonsignatories could be compelled to arbitrate while noting that "[t]he defendants make no such claim in this case."

[11]*Johnson* resolved only the narrow question whether a duly authorized health care proxy's signature on an arbitration agreement could be binding on the patient, her principal. 466 Mass. at 780. Concluding that an arbitration was not a health care decision, the Supreme Judicial Court answered the question in the negative. *Id.* at 781. Given the holding of *Johnson*, *Licata* also considered other theories whereby the health care proxy's signature on an arbitration agreement might bind his principal, concluding that, in those circumstances, the principal was not bound. 466 Mass. at 799-804.

Arbitration Act, it is appropriate to give strong weight to decisions in other jurisdictions." *O'Brien* v. *Hanover Ins. Co.*, 427 Mass. 194, 201 (1998). For the same reasons, we give similar weight to decisions applying the Federal Arbitration Act. See *Miller* v. *Cotter*, 448 Mass. at 679. Multiple Federal Circuit Courts of Appeals have addressed the question whether a signatory can compel a nonsignatory to arbitrate. We find these cases persuasive and adopt their approach here.

2. *Who determines arbitrability and how.* The question whether Walker is bound by the arbitration agreement between Collyer[12] and The Oaks is a "gateway dispute" that was an issue for the court, and not the arbitrator, to decide in the first instance. See *Massachusetts Hy. Dept.* v. *Perini Corp.*, 444 Mass. 366, 375-376 (2005), quoting from *Howsam* v. *Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83-84 (2002). We require clear and unmistakable evidence of intent in order to require the parties to arbitrate the question of arbitrability. See *Massachusetts Hy. Dept.* v. *Perini Corp.*, 83 Mass. App. Ct. 96, 100-101 (2013), citing *First Options of Chicago, Inc.* v. *Kaplan*, 514 U.S. 938, 944 (1995). Where, as here, a party "attacks the very existence of an agreement, as opposed to its continued validity or enforcement," a court must resolve the question of arbitrability. *DK Joint Venture 1* v. *Weyand*, 649 F.3d 310, 317 (5th Cir. 2011) (*DK Joint Venture 1*) (quotation omitted).

Here, we do not have the requisite evidence of intent. The Oaks and Collyer clearly and unmistakably agreed to arbitrate disputes between them. The arbitration agreement states:

> "By signing this agreement, the resident agrees with the Facility that any dispute regarding (1) any services . . . ; (2) any dispute arising out of the diagnosis, treatment, or care of the resident, including the scope of this arbitration clause; or (3) the *arbitrability of any claim or dispute,* against whomever made (including, to the full extent permitted by applicable law, third parties who are not signatories to this agreement) shall be resolved by binding arbitration by the National Arbitration Forum . . ." (emphasis added).

---

[12]The parties make no argument that Collyer, as administratrix of Karl's estate, is not bound by the arbitration agreement he signed.

While the agreement goes on to discuss the wide array of parties to which it applies, we cannot say that this clause clearly and unmistakably shows that the parties to this dispute — Walker and Collyer, rather than The Oaks and Collyer — agreed to arbitrate questions about arbitrability. Because Walker did not "personally [sign the agreement], it certainly follows that there is no 'clear and unmistakable' evidence that [he] intended to delegate questions of arbitrability to the arbitrator." *DK Joint Venture 1*, 649 F.3d at 317 n.9. See *PaineWebber Inc.* v. *Elahi*, 87 F.3d 589, 599 (1st Cir. 1996) ("certainly a party who did not sign the agreement did not consider who should decide arbitrability"). We thus determine the issue "summarily."

3. *Circumstances compelling arbitration.* "[T]he superior court may stay an arbitration proceeding commenced or threatened if it finds that there is no agreement to arbitrate." G. L. c. 251, § 2(*b*). When there is a dispute as to a material fact, "the judge conducts an expedited evidentiary hearing on the matter and then decides the issue." *McInnes* v. *LPL Financial, LLC*, 466 Mass. 256, 261 (2013). When "there is not such a dispute, the judge resolves the issue as a matter of law." *Ibid.* We resolve this case as a matter of law because there is no dispute as to a material fact with respect to the legal conclusions below. We review matters of law de novo. See *Deutsche Bank Natl. Assn.* v. *First Am. Title Ins. Co.*, 465 Mass. 741, 744 (2013). We consider now under what circumstances a nonsignatory to an arbitration agreement can be compelled to arbitrate by a signatory to such an agreement, applying the test laid out by the Federal courts, which we find persuasive.[13]

"Absent advance consent to [a contractual] agreement, a party cannot be compelled to arbitrate a dispute." *Constantino* v. *Frechette*, 73 Mass. App. Ct. at 354. See *United Steelworkers of America* v. *Warrior & Gulf Nav. Co.*, 363 U.S. 574, 582 (1960); *Intergen N.V.* v. *Grina*, 344 F.3d 134, 137 (1st Cir. 2003)

---

[13]As we have noted, our courts have decided the mirror image question, whether a party who did not sign an arbitration agreement can take advantage of an agreement signed by an allied party to force a signatory to arbitrate. Compare *Constantino* v. *Frechette*, 73 Mass. App. Ct. at 356-359 (nonsignatory employees of nursing home could not enforce arbitration agreement signed by employer), with *id.* at 357 & n.11 (discussing *Miller* v. *Cotter*, 448 Mass. at 681-684; nonsignatory nursing home employees could compel arbitration).

("abecedarian tenet that a party cannot be forced to arbitrate if it has not agreed to do so"). But the obligation to arbitrate is not limited to those who have signed an arbitration agreement. *Thomson-CSF*, 64 F.3d at 776. Exceptions to the general rule binding parties only to arbitration agreements they have signed arise out of common-law principles of agency and contract law. *Ibid.* The Federal courts have recognized six bases for enforcing an arbitration agreement with respect to a nonsignatory: (1) incorporation by reference, (2) assumption, (3) agency, (4) veil-piercing/alter ego, (5) estoppel, and (6) third-party beneficiary.[14] See *ibid.* (enumerating the first five bases); *Bridas*, 345 F.3d at 356. See also *Intergen N.V.* v. *Grina*, 344 F.3d at 145-150. As we shall discuss, these theories do not apply equally in a situation where a signatory is attempting to force a nonsignatory to arbitrate as opposed to the reverse situation. See, e.g., *Bridas, supra* at 363 (as to third-party beneficiary theory).

Of the six bases for mandating arbitration listed above, Collyer argues that under theories of estoppel and agency, Walker is required to arbitrate.

a. *Estoppel.* Collyer argues that Walker is bound by estoppel to arbitrate this dispute. "[B]y knowingly exploiting [an] agreement, [a party is] estopped from avoiding arbitration despite having never signed the agreement." *Thomson-CSF*, 64 F.3d at 778. The primary form of estoppel ("direct benefits estoppel") allows a signatory to compel to arbitration a nonsignatory party receiving a direct benefit from an arbitration agreement. *Id.* at 778-779. See *Licata*, 466 Mass. at 804. Conversely, an alternative path to estoppel allows a *nonsignatory* to compel a *signatory* to arbitrate when (a) the nonsignatory has a close relationship with a signatory and (b) the underlying issues for arbitration are intertwined with an agreement the estopped party has actually signed. *Thomson-CSF, supra* at 779. Neither of these forms of estoppel allows Collyer to compel Walker to arbitrate. We address each form in turn.

---

[14]The third-party beneficiary doctrine is similar to the estoppel basis except that courts look to different snapshots in time. *E.I. DuPont de Nemours & Co.* v. *Rhone Poulenc Fiber & Resin Intermediates, S.A.S.*, 269 F.3d 187, 200 n.7 (3d Cir. 2001). For the third-party beneficiary theory, courts look to the intentions of the parties when a contract is signed; for estoppel, courts look to the parties' conduct after a contract is executed. *Ibid.*

i. *Direct benefits estoppel.* For direct benefits estoppel, an entity "knowingly exploiting an agreement with an arbitration clause can be estopped from avoiding arbitration despite having never signed the agreement." *MAG Portfolio Consult, GMBH* v. *Merlin Biomed Group LLC.*, 268 F.3d 58, 61 (2d Cir. 2001) (*MAG Portfolio*) (quotation omitted). Someone who "knowingly accepted the benefits" of such an agreement may be bound by the arbitration clause. *Ibid.*, quoting from *Deloitte Noraudit A/S* v. *Deloitte Haskins & Sells, U.S.*, 9 F.3d 1060, 1064 (2d Cir. 1993) (*Deloitte Noraudit*). The benefits must be direct — "flowing directly from the agreement." *MAG Portfolio, supra.* The benefits are indirect — thus not estopping the party — "where the nonsignatory exploits the contractual relation of parties to an agreement, but does not exploit (and thereby assume) the agreement itself." *Ibid.*

In arguing that Walker benefited from the arbitration agreement, Collyer contends only that "Dr. Walker, should he have elected to enforce the arbitration provision, could avoid the uncertainty and expense of litigation and a jury trial . . . ." We assume without deciding that Walker could opt into the arbitration. See note 13, *supra.* However, even assuming that Walker *could* avail himself of the arbitration agreement, that does not mean that he *must.* It appears Walker has determined, for whatever reason, that the arbitral forum does not benefit him in this case. The possibility of enforcing the arbitration agreement would provide Walker with some benefit, but this minimal benefit is not enough to compel him to arbitrate against his wishes.[15]

In *Deloitte Noraudit*, the United States Court of Appeals for the Second Circuit held that the plaintiff was estopped from claiming that it was not bound by an arbitration clause because it had knowingly accepted the benefit of an agreement containing the arbitration clause by continuing to use the name "Deloitte" pursuant to that agreement and because it had failed to object to the arbitration provision when it became aware of it. 9

---

[15]Because we determine that, even if the arbitration agreement afforded Walker the right to compel some patient to arbitrate, that benefit would not be enough to estop him from seeking to escape arbitration here, we need not decide whether Walker would actually be able to compel a patient to arbitrate based on the language of the agreement. The question whether the agreement gave him those rights is immaterial.

F.3d at 1064. Unlike in *Deloitte Noraudit,* however, here Walker never expressly availed himself of any benefit flowing from the arbitration agreement. The opportunity to receive income from treating Karl as an attending physician or from Walker's duties as subacute rehab program medical director is not such a benefit. The opportunity to treat Karl cannot be traced to the arbitration agreement because the agreement itself states, in large text at the top of the agreement, that "signing this agreement is not a condition of admission." Compare *Miller* v. *Cotter,* 448 Mass. at 681-682 & nn. 14, 15. Thus, Walker would have had the opportunity to treat Karl irrespective of whether Karl had signed the arbitration agreement. Also unlike in *Deloitte Noraudit, supra* at 1064, it is undisputed that Walker was not even aware of the arbitration agreement prior to these proceedings. Thus, the possibility of being able to avail himself of the arbitration agreement is a minimal indirect benefit that "is not the sort of benefit which this [c]ourt envisioned as the basis for estopping a nonsignatory from avoiding arbitration." *Thomson-CSF,* 64 F.3d at 779.

Walker's situation is closer to several cases where the Federal courts have refused to bind a party through estoppel than it is to *Deloitte Noraudit, supra.* See, e.g., *MAG Portfolio,* 268 F.3d at 62-63; *Bridas,* 345 F.3d at 362. As discussed in *MAG Portfolio, supra* at 61, any benefit that Collyer might identify "is indirect where the nonsignatory exploits the contractual relation of parties to an agreement, but does not exploit (and thereby assume) the agreement." As in *Thomson-CSF,* where, notwithstanding the plaintiff's awareness of the arbitration clause in a broader "working agreement," and the indirect benefits the plaintiff received, it was not bound to arbitrate because it had not taken action pursuant to the working agreement, here, Walker has not taken any action pursuant to the arbitration agreement. See *Thomson-CSF,* 64 F.3d at 775-776, 779. Walker has not sued to enforce the arbitration agreement. He has not attempted to compel Collyer to arbitrate — even though the agreement may have given him the right to do so. Compare *Bridas,* 345 F.3d at 362 (no suit brought under contract that included arbitration provision). Contrast *Deloitte Noraudit,* 9 F.3d at 1064. The arbitration agreement here is a discrete document, rather than a part of

a larger contract, as in *Deloitte Noraudit*. Thus, other than taking action to compel arbitration, which Walker has not done, the opportunity to exploit the arbitration agreement "to the degree that the cases that consider applying this version of estoppel require," *Bridas, supra*, is simply not present here.

ii. *Alternative form of estoppel.* Nor does the alternative form of estoppel apply in this case. Courts applying the alternative form of estoppel have only allowed a *nonsignatory* to compel a *signatory* to participate in arbitration. See *Thomson-CSF*, 64 F.3d at 779. They have done so when (a) the nonsignatory has a close relationship with a signatory and (b) the underlying issues for arbitration are intertwined with an agreement the estopped party has signed. See *ibid.* There is a significant distinction between forcing a nonsignatory to arbitrate and allowing a nonsignatory to compel a signatory to arbitrate. As stated in *Thomson-CSF*, "the nature of arbitration makes [this distinction] important [because] [a]rbitration is strictly a matter of contract; if the parties have not agreed to arbitrate, the courts have no authority to mandate that they do so." *Ibid.* See *Merrill Lynch Inv. Managers* v. *Optibase, Ltd.*, 337 F.3d 125, 131 (2d Cir. 2003) (*Merrill Lynch*). Here, a *signatory* (Collyer) seeks to compel a *nonsignatory* (Walker) to arbitrate on the basis of his relationship with another signatory (The Oaks). But, relying on traditional principles of contract and agency law, the cases establishing this form of estoppel limit the use of the form to the compulsion of *signatories* to arbitrate. See *Thomson-CSF, supra* at 779; *Merrill Lynch, supra*. Like the primary form of estoppel discussed above, the alternative form of estoppel does not justify compelling Walker to arbitrate.[16]

---

[16]As to the related theory that Walker could be compelled to arbitrate as a third-party beneficiary of the arbitration agreement, Collyer did not continue to press the argument in her postargument submission. Nevertheless, even assuming without deciding that Walker is a third-party beneficiary of the arbitration agreement between Collyer and The Oaks, as with the theory of direct benefits estoppel, courts are reluctant to compel a nonsignatory third-party beneficiary to arbitrate. See *Bridas*, 345 F.3d at 363 (court aware of no case where "a third-party beneficiary has been bound to arbitrate a dispute, arising under an agreement to which it is not a party, that the third-party itself did not initiate in court"). Some ten and one-half years after *Bridas*, we are still aware of no such case. Like the United States Court of Appeals for the Fifth Circuit, we decline to break that new ground. See *ibid.*

b. *Agency*. Collyer argues that Walker was an agent of The Oaks in his role as subacute rehab medical director, and thus was bound by the arbitration agreement because of the clause purporting to include "agents" in the agreement's coverage. In the alternative, Collyer argues that Walker is bound as an "apparent agent" of The Oaks. But Collyer relies on a mistaken understanding of the agency exception to the general rule that parties may not be bound by arbitration agreements they did not sign. Ultimately, it is immaterial whether Walker was an agent of The Oaks because the exception only allows agents to bind principals by their actions, rather than vice versa. Walker cannot be compelled to arbitrate by virtue of the agency exception.

"Agency" is one of the well-established exceptions to the general rule that parties cannot be bound by an arbitration agreement they did not sign. See, e.g., *Merrill Lynch*, 337 F.3d at 129, citing *Thomson-CSF*, 64 F.3d at 776. Under "ordinary principals of contract and agency law," see *DK Joint Venture 1*, 649 F.3d at 317, an agency relationship itself is insufficient to compel a nonsignatory *agent* to arbitrate in accordance with an agreement signed by the *principal*. See *ibid.* Once again, it is critical to ask who is seeking to bind whom: the question whether a principal's acts bind an agent is fundamentally different from the question whether an agent's acts bind a principal.[17]

The seminal cases that establish the agency exception pertain to the binding of a principal to arbitrate by virtue of the actions of an agent — not the reverse situation, which we find in this case. See, e.g., *A/S Custodia* v. *Lessin Intl., Inc.*, 503 F.2d 318, 320 (2d Cir. 1974); *Interbras Cayman Co.* v. *Orient Victory Shipping Co., S.A.*, 663 F.2d 4, 6-7 (2d Cir. 1981) (triable question whether an agreement by an agent allegedly on behalf of the principal could afford the principal the right to compel a contracting party to arbitrate).[18]

A close reading of the contemporary cases confirms that the

[17]The question presented here also differs from that faced in *Miller* v. *Cotter*, *supra*, and *Constantino* v. *Frechette*, *supra*, as to whether nonsignatory employees can, if they wish, compel a patient-signatory to arbitrate pursuant to an agreement signed by their employer. See note 13, *supra*.

[18]We note also that *Interbras* involves the ability of a nonsignatory to compel arbitration rather than, as here, the possibility that a nonsignatory would be compelled to arbitrate.

agency exception remains confined to the acts of an agent binding a principal rather than vice versa. In *Bridas*, the United States Court of Appeals for the Fifth Circuit considered whether the actions of the alleged agent (Turkmenneft) could bind the putative principal (the government of Turkmenistan). 345 F.3d at 356-358. The court concluded that the agreement did not bind the government because Turkmenneft did not sign the agreement as an agent of the government. *Id.* at 358. Similarly, in *Merrill Lynch*, the Second Circuit considered whether one investment firm could be compelled to arbitrate by a customer on the theory that a sister company had signed an arbitration agreement with the customer, acting as agent on behalf of the original firm. 337 F.3d at 128-131. Citing its earlier decision in *Thomson-CSF*, 64 F.3d at 780, the court concluded that the relationship between the companies was an insufficient basis on which to "bind [the] non-signatory on agency principles to an arbitration." *Id.* at 130-131. Although these cases do not explicitly state that the agency exception is limited to circumstances of agents binding principals to arbitrate rather than vice versa, that conclusion emerges from their clear reasoning and consistent outcomes. Moreover, this conclusion accords with general principles of contract and agency law. See *Bel-Ray Co.* v. *Chemrite (Pty) Ltd.*, 181 F.3d 435, 445 (3d Cir. 1999) ("Generally, of course, an agent of a disclosed principal, even one who negotiates and signs a contract for her principal, does not become a party to the contract").

Given this legal analysis, the factual dispute among the parties is immaterial. The parties dispute whether Collyer's claims involve Walker only in his role as attending physician or also in his role as the subacute rehab medical director. They also dispute whether Walker was an agent of The Oaks in his medical director capacity — and thus covered by the arbitration agreement, according to Collyer's reading. Because the applicable law only allows the binding of a principal by an agent's actions rather than vice versa, it is immaterial whether Walker was actually an agent of The Oaks. Whether he was an agent or was solely a nonagent independent contractor, he cannot be compelled to arbitrate this dispute by virtue of any "ordinary principle" of agency law.

Alternatively, Collyer argues that Walker is bound by the

agreement as an "apparent agent." We disagree. Notwithstanding any actions by The Oaks giving authority to Walker, there are no grounds for binding an *agent* to a *principal's* agreement. Apparent authority allows a principal to be bound by the actions of an agent based on "written or spoken words or any other conduct of the principal which, reasonably interpreted, causes the third person to believe that the principal consents to have the act done on his behalf." *Theos & Sons, Inc.* v. *Mack Trucks, Inc.*, 431 Mass. 736, 745 (2000), quoting from Restatement (Second) of Agency § 27 (1958). See *Licata*, 466 Mass. at 801-802. These cases do not stand for the proposition that a theory of apparent authority provides a separate route to bind an agent by virtue of his principal's acts. Thus, Walker is no more compelled to arbitrate by a theory of "apparent agency" than he is bound to arbitrate by pure agency principles.[19]

*Conclusion.* As in *Thomson-CSF*, the trial court and the arbitrator here "improperly extended the limited theories upon which [we are] willing to enforce an arbitration agreement against a nonsignatory." 64 F.3d at 780. None of the exceptions to the general rule that parties can only be compelled to arbitrate with their consent apply here. As a nonsignatory, Walker may not be compelled to arbitrate by Collyer, a signatory to the arbitration agreement.

The judgment is reversed, and the case is remanded to the Superior Court for entry of a new judgment declaring that Walker is not bound by the "Voluntary Agreement for Arbitration" and may not be compelled to participate in the arbitration proceeding.[20]

*So ordered.*

---

[19]Collyer also argues that language in the arbitration agreement purporting to bind "directors" compels Walker to arbitrate by virtue of his role as subacute rehab medical *director*. Even assuming this refers to Walker in his capacity as a medical director, this language binds Walker — as a nonsignatory — no more than the language in the agreement purporting to encompass agents. The wording does nothing either to broaden these exceptions or to fit Walker into one of them.

[20]Because we conclude that principles of agency and contract law do not allow Collyer to compel Walker to arbitrate this dispute, we need not consider Walker's constitutional claim that compelling him to arbitrate without his consent would violate his right to a trial by jury.